**Charles L. FEATHER t/a Feather Trucking; Thomas V. Patterson; Lawton Trucking, Inc.; D.P. Zimmerman, Jr.; Michael D. Rose; David B. Smogyi; Donald Benyack; Ruth A. Cordes, Admx. Est. Edward W. Cordes, Jr.; Everett C. Teeter, Jr., t/a Everett C. Teeter Trucking; William Nileski and Robert C. Ermin, Cross-Appellants in Nos. 82–5464 & 83–5327**

v.

**UNITED MINE WORKERS OF AMERICA and District 2, United Mine Workers of America and Local 1600, United Mine Workers of America, Appellants in Nos. 82–5438 & 83–5326.**

**Nos. 82–5438, 82–5464, 83–5326 and 83–5327.**

United States Court of Appeals, Third Circuit.

Argued May 9, 1983.

Decided June 30, 1983.

As Amended July 11, 1983.

See also, D.C., 494 F.Supp. 701.

Michael Holland, Gen. Counsel, Kurt Kobelt (argued), Harrison Combs, United Mine Workers of America, Washington, D.C., Melvin P. Stein (argued), Lou Ann Phelps, Pittsburgh, Pa., for cross-appellants in Nos. 82–5438 & 83–5326.

Jerald R. Cureton (argued), Fred J. Berg, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., Paul Hirschfield, Pittsburgh, Pa., for cross-appellants in Nos. 82–5464 & 83–5327.

Before ADAMS and WEIS, Circuit Judges and DEBEVOISE, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

During the latter part of 1974, the United Mine Workers of America ("UMWA" or "the Union") and the Bituminous Coal Operators Association ("BCOA"), a multi-employer bargaining association of coal producers, renegotiated the National Bituminous Coal Wage Agreement ("NBCWA"). The agreement contained a provision which prohibited coal haulers who were not signatories to the 1974 NBCWA from transporting coal from BCOA mines. A group of coal haulers brought this action seeking damages under the federal labor and antitrust laws for injuries allegedly caused by that clause. The district court concluded that the Union was liable under section 303 of the National Labor Relations Act, 29 U.S.C. § 187, but that the UMWA's conduct fell within the non-statutory labor exemption from the Clayton Act's treble damage provision. 15 U.S.C. § 15.

In this appeal, the Union does not question the determination of liability under section 301, but it does advance a number of contentions regarding the damage calculations under that section. The coal haulers have cross-appealed to contest the district court's holding that the Union is exempt from antitrust liability. We will affirm the district court on the antitrust issues and remand for further findings with respect to the damage calculations under section 301.

I

The master collective bargaining agreement that covers unionized mines in Western Pennsylvania is the National Bituminous Coal Wage Agreement. Prior to 1974, the NBCWA did not contain a provision that explicitly defined the work jurisdiction of the UMWA. When the Union began its preparations in 1974 to renegotiate the 1971 NBCWA, due to expire on November 11, 1974, one of its objectives was to eliminate the use of subcontractors to haul coal from the mines; ensure that the Union members would perform this task. The UMWA's initial set of contract proposals for its negotiations with the BCOA included a provision that would have banned all such subcontracting. The Union also sought new provisions regarding mine safety, sick leave, supplemental unemployment benefits and an overhaul of the grievance and arbitration procedures.

Formal negotiations with the BCOA began on September 3, 1974. They proceeded slowly because so much of the contract was being renegotiated. Forty-three separate sessions were held and the 1971 contract was ultimately expanded from 56 pages to 129 pages. On November 4, a strike became inevitable: the UMWA's constitution mandates a policy of "No Contract, No Work," and a minimum of eight days is required to conduct a secret ballot vote of the union membership on any proposed contract. The BCOA first agreed to the idea of including a work jurisdiction clause in

---

* Honorable Dickinson R. Debevoise, United States District Court for the District of New Jersey, sitting by designation.

the agreement of November 9, but rejected the union's proposal of a ban on all subcontracting. As an alternative, the BCOA proposed what ultimately became Article II(g) of the agreement, limiting the subcontracting of coal hauling to "contractors employing members of the UMWA under the [NBCWA]." The district court concluded that this provision violated Section 8(e) of the NLRA because it was a "hot cargo" clause, an agreement between an employer and a union that the employer will cease doing business with a third party. The court also determined that the union's original proposal would not have violated the Labor Act.

When the parties opened their bargaining session on November 11, 1974, the day before the 1971 agreement was to expire, they had reached agreement on only a few points. Issues still unresolved included mine safety, wages, shift differentials, certain fringe benefits, cost of living adjustments, pension contributions and health benefits. Many portions of Article II, the "Scope and Coverage" provisions, also remained unresolved, including Article II(g), the transportation of coal clause.

The UMWA strike against the BCOA mines began at 12:01 a.m. on November 12, 1974, when the 1971 agreement officially expired. A tentative agreement was reached on all issues by the negotiators on the morning of November 13, but the union leadership sought to renegotiate five issues in that agreement before having its members vote on the proposal. Not reconsidered was the clause dealing with the transportation of coal. The BCOA strike ended on December 6, 1974, when the agreement was ratified by the union membership and a final contract signed.

Many mines did not, however, reopen on that date. The coal mine construction companies and the unionized coal hauling companies who were signatories to the expired 1971 NBCWA, but who were not part of the BCOA, had not yet signed a new agreement with the UMWA. The union construction workers picketed the mines to protest the miners' returning to work before the con-

struction contract was settled. Because many mine workers would not cross those picket lines, several BCOA mines did not reopen until December 23, when the construction agreement was signed.

During the time the UMWA was preparing for its negotiations with the BCOA, it also engaged in sporadic discussions with a group of the coal hauling companies that had signed the 1971 NBCWA. This group, the Western Pennsylvania Coal Haulers' Association ("WPCHA"), was seeking a separate contract in 1974, rather than have its members continue as signatories to the NBCWA. The negotiations with the WPCHA were not pursued with great vigor by either side until the BCOA strike ended.

In September 1974, the Union sent the WPCHA a copy of its initial proposals for the 1974 NBCWA that had been submitted to the BCOA. On October 11, 1974, the WPCHA made a counter-proposal concerning drivers' wages. On October 30, the WPCHA requested a 30-day extension of the 1971 NBCWA, which the union rejected. Accordingly, on November 12, when the NBCWA expired, the union struck the WPCHA as well as the BCOA. Because the agreement reached on December 6 covered only BCOA employees, the employees of WPCHA members continued their strike until the end of December. At that time, the Union agreed to extend the 1971 NBCWA for 30 days while negotiations continued. After 30 days, no agreement had been reached, and the strike resumed. Although the record is not explicit, it appears that the WPCHA members ultimately signed the 1974 NBCWA.

When the BCOA strike ended on December 6, 1974, the Union began its attempts to enforce Article II(g) of the 1974 NBCWA, the clause limiting coal hauling to companies that agreed to sign the 1974 NBCWA. Pickets were set up at BCOA mines using non-signatory haulers; union officials visited those haulers and informed them that they would not be permitted to haul unless they signed the 1974 NBCWA. Picketing and the visitations continued sporadically until the beginning of April 1975. The

number of coal haulers who signed the NBCWA increased from 39 in the 1971 agreement to 366 in the 1974 agreement.

On July 23, 1976, eleven western Pennsylvania coal haulers filed this action against the international, the district, and the local unions (collectively "UMWA" or "the Union"), seeking damages resulting from the Union's attempts to force them to sign the 1974 NBCWA and to prevent BCOA members from using non-signatory haulers to transport coal. The first count, brought under section 303 of the NLRA, 29 U.S.C. § 187, alleged that the Union had violated sections 8(b)(4) and 8(e) of the Labor Act, 29 U.S.C. §§ 158(b)(4) & (e), because Article II(g) of the 1974 NBCWA constituted an unlawful "hot cargo" clause. Counts II and III charged the Union with violating the federal antitrust laws. The district court certified the case as a class action on September 3, 1977.

The district court conducted a bench trial on the liability issues and, on June 27, 1980, found the Union liable on Count I, but exempt from liability on Counts II and III. The case was then referred to a magistrate to calculate damages for the plaintiffs. After hearings, the magistrate entered proposed findings as to the three plaintiffs involved in this appeal. In her report, she considered the union liable for damages from the date the BCOA strike began. She recommended that damages be awarded to the three plaintiffs and that pre-judgment interest be given to Beunier and Henderson, but not to H & H. The district court adopted the magistrate's recommendations in an order dated June 23, 1982.[1] Both sides appealed from that order.

Three hauling companies are parties to this appeal: Paul Henderson Trucking ("Henderson"), Ronald Beunier Trucking Company ("Beunier") and H & H Hauling Company, Inc. ("H & H"). Henderson, a signatory to the 1971 NBCWA, hauled coal almost exclusively for a BCOA member mine which was closed by the BCOA strike. Henderson at first refused to sign the 1974

agreement, but changed his mind, allegedly as a result of pressure, and signed the agreement on December 30, 1974. He did not haul coal from November 12 to December 30, 1974.

Beunier was a member of the UMWA, but his trucking company was not a signatory to the 1971 agreement. He hauled coal exclusively from BCOA mines, all of which were idled by the BCOA strike. During January and February, 1975, union representatives disrupted Beunier's hauling business, and threatened that he would not be permitted to haul coal if he did not sign the agreement. On February 24, 1975, Beunier signed the 1974 agreement.

H & H Hauling, a group of companies operated by William and Douglas Hanna, is the final plaintiff involved in this appeal. None of Hanna's companies, employees, or customers were affiliated with the UMWA at any time during these proceedings. None of H & H's businesses was ever asked to sign the 1974 NBCWA, and none of H & H's employees was asked to join the UMWA. A few days after the start of the BCOA strike, a number of individuals wearing UMWA logos on their clothing appeared at the Hanna garage and asked the Hannas not to haul during that strike. Apparently because of fear of reprisals, the mining companies for whom the Hannas hauled shut down during the BCOA strike.

The UMWA admits that it violated sections 8(b)(4) & (e) of the NLRA by seeking to enforce Article II(g) after the 1974 NBCWA was signed by the Union and the BCOA, at the conclusion of the strike against the BCOA. In this appeal, the Union's primary contention is that the district court erred in the damage phase of the case when it imposed liability on the Union for losses the plaintiffs incurred *during* the BCOA strike. The Union also argues that H & H is not entitled to recover any damages because it failed to show that its injuries were caused by agents of the UMWA and that the conduct, even if attributed to the Union, was not within the scope of the

---

**1.** Judge Knox, who presided over the liability trial, died before the magistrate issued her rec-

ommendations. The matter was then assigned to another judge.

liability judgment. In addition, the UMWA claims that the district court abused its discretion in awarding prejudgment interest to Beunier and Henderson. The plaintiffs' cross-appeal challenges the district court's conclusion that the UMWA is exempt from liability under the antitrust laws.

## II

Before turning to the merits of the parties' claims, we must first address a jurisdictional matter. This case was certified as a class action by the district court, and there may be as many as a thousand members of the plaintiff class. The order of the district court from which the parties have appealed awards damages to only three coal haulers. Damages have not yet been calculated for any of the other plaintiffs. Inasmuch as all the claims of all the parties had not been finally adjudicated by the district court's order of June 23, 1982, that order was interlocutory, and thus, under most circumstances, it could not be appealed under 28 U.S.C. § 1291 until a final order is entered.[2] See *Tilden Financial Corp. v. Palo Tire Service, Inc.,* 596 F.2d 604, 606 (3d Cir.1979).

Because the order disposed of all the claims of three of the plaintiffs, the district court could have certified it as final, and thus appealable, as to those parties under Fed.R.Civ.P. 54(b).[3] Neither side requested certification, however, and instead filed notices of appeal on the theory that we had jurisdiction directly under section 1291. After all briefs had been filed, but before the date scheduled for disposition of the appeals, the parties were made aware of the jurisdictional defect. On April 27, 1983, at the request of the parties, the district court amended its order of June 23, 1982 to include the findings required for a Rule 54(b) appeal. The parties then filed new notices of appeal.

Both sets of notices now properly confer jurisdiction on this Court. The later notices, filed within 10 days of the district court's amendment of its previous order, are clearly appealable under Fed.R.App.P. 4(a). The earlier notices, although defective when filed, have been cured by the district court's subsequent certification under Fed.R.Civ.P. 54(b). *See Cape May Greene, Inc. v. Warren,* 698 F.2d 179 (3d Cir.1983); *Tilden Financial Corp. v. Palo Tire Service, Inc., supra.*

## III

Having determined that we have jurisdiction over all the appeals before us in this matter, we now proceed to consider the merits of the claims presented.

The Union's first challenge to the damage order is to the inclusion of the period of the BCOA strike, November 12 to December 6, 1974, in the calculation of compensable losses suffered by the plaintiffs. The UMWA maintains that an award of damages for that period is not authorized by the liability opinion which, the Union claims, held it liable only for seeking to enforce the unlawful Article II(g) after the 1974 NBCWA was adopted by the BCOA and the Union. In addition, the UMWA argues that an award covering the BCOA strike is improp-

---

**2.** 28 U.S.C. § 1291:

The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court....

**3.** Rule 54(b) provides:

(b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before *the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

er because its unlawful conduct did not cause the damages incurred during that time. The Union contends that the magistrate and the district court erred by equating the court's initial finding of liability under section 8(b)(4) with the finding of causation required before damages may be assessed. We reject the Union's first argument, that the damage award exceeded the scope of the liability determination, but find merit in its claim that the record does not contain an adequate finding of causation as required by section 303. Accordingly, we will remand the matter to the district court for further consideration of that issue.[4]

Section 8(b)(4) of the Labor Act prohibits unions from engaging in "secondary" activities—striking or threatening one employer for the purpose of putting pressure on another employer to accede to union demands.[5] One common type of secondary activity is represented by the "hot cargo" clause. Hot cargo clauses are prohibited by section 8(e) of the Labor Act, and the use of strikes or other forms of coercion to obtain such clauses is outlawed by section 8(b)(4)(A).[6] Section 8(b)(4)(B) makes it un-

lawful to enforce a hot cargo clause already obtained.[7]

In the present case, the Union argues that the district court's first opinion found the UMWA liable only under section 8(b)(4)(B) for *enforcing* Article II(g) once the 1974 NBCWA went into effect between the BCOA and the Union. Since that provision could not have been enforced before the parties agreed to it, and since there was no explicit finding that the Union violated section 8(b)(4)(A) by seeking an agreement with the BCOA to include Article II(g) in the contract, the UMWA contends that the period of damage liability commenced no earlier than December 6, 1974, when the NBCWA was adopted. To support this position, the Union relies on portions of the liability opinion discussing the Union's conduct after December 6 and the district court's specific references to section 8(b)(4)(B).

■ The Union's argument fails to take into account the district court's ultimate conclusion of law with regard to the secondary boycott issues. The district court held

---

**4.** The district court initially referred this case to the magistrate only for a determination of damages. Although causation may more properly be considered an aspect of liability rather than damages, the parties stated at oral argument that they had placed the causation question before the magistrate and indicated their willingness to allow her to resolve that issue on remand. Thus, the district court may, if it so wishes, return the entire case to the magistrate for her initial recommendations.

**5.** Section 8(b)(4) provides in part:

(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

(4)(i) *to engage in, or to induce or encourage* any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or

employer organization or to enter into any agreement which is prohibited by subsection (e) of this section [29 U.S.C. § 158(e) ];

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

\* \* \* \* \* \*

29 U.S.C. § 158(b)(4).

**6.** Subsection (A) contains other prohibitions as well. See text of section 8(b)(4)(A), *supra* note 5.

**7.** Subsection (B) contains other prohibitions as well. See text of section 8(b)(4)(B), *supra* note 5.

that the Labor Act was violated by the UMWA's "striking to force *coal mine companies* and coal haulers to sign the agreement...." 494 F.Supp. at 720 (emphasis added). Thus, it must have meant to impose liability under section 8(b)(4) for the period of the BCOA strike. We reach this conclusion even though the district court followed this holding with a citation to section 8(b)(4)(B), the enforcement provision, and not to section 8(b)(4)(A), the clause governing attempts to obtain hot cargo agreements. The district court apparently did not distinguish between the two provisions, and understood section 8(b)(4)(B) to cover "[a] strike to force an employer to sign an agreement which contains a hot cargo clause in violation of section 8(e)." 494 F.Supp. at 710. Since the import of the decision by the district court is clearly that the Union's conduct both during and after the BCOA strike constituted unlawful secondary activity, we will not invalidate that determination merely because of a failure to cite all the relevant subsections of the Act.

▪ Our affirmance of the Union's section 8(b)(4) liability for the period of the BCOA strike does not mandate a conclusion that the plaintiffs are entitled to recover damages under section 303 for all losses that might be attributable to that strike, regardless of causation. Section 303(a) makes it unlawful for a labor union to violate section 8(b)(4), 29 U.S.C. § 187(a). *See Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). When a union strikes, and one purpose of that strike is to obtain or enforce a hot cargo agreement, sections 8(b)(4) and 303(a) are violated. *National Labor Relations Board v. Denver Building & Construction Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). In a companion case to *Denver Bldg. Trades, International Brotherhood of Elec. Workers v. National Labor Relations Board,* 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), the Court stressed that "it was sufficient that *an* objective of the picketing, although *not necessarily the only* objective of the picketing, was to force [the employer] to ... cease

doing business with [another employer]." 341 U.S. at 700, 71 S.Ct. at 957. In the case before us, Article II(g) of the 1974 NBCWA was a hot cargo clause, and one of the objectives of the BCOA strike was to seek agreement on that clause. Therefore, by engaging in that strike, the UMWA violated section 303(a).

The damage portion of section 303, subsection (b), provides that "[w]hoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor...." 29 U.S.C. § 187(b). As the words "by reason of" make clear, section 303(b) requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff. *See Frito-Lay, Inc. v. Local Union No. 137, Int'l Brotherhood of Teamsters,* 623 F.2d 1354 (9th Cir.), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980); *Mead v. Retail Clerks Int'l Assn.,* 523 F.2d 1371 (9th Cir.1975); *Riverside Coal Co. v. United Mine Workers of America,* 410 F.2d 267 (6th Cir.1969); *cert. denied,* 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969). *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (construing antitrust damage provision containing "by reason of" requirement of 15 U.S.C. § 15); *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (antitrust causation); *Albrecht v. Herald Co.,* 452 F.2d 124 (8th Cir.1971), *on remand from* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (antitrust causation). If the plaintiff would have been harmed regardless of the section 8(b)(4) violation, then of course there can be no recovery.

In *Mead v. Retail Clerks, supra,* the Ninth Circuit reviewed a factual situation very similar to that in the present case and discussed at some length the proper method of applying the causation requirement of section 303(b) to such a setting. One of the proposals in the collective bargaining agreement being negotiated between the plaintiffs and the defendant union was an illegal hot cargo clause. All the other terms under consideration such as wages, pensions and a

health and welfare plan were lawful. When the parties could not agree on a contract, the union struck. The district court found that one object of the otherwise lawful strike was to obtain the hot cargo agreement and that the strike caused the plaintiffs' injury. From its findings, the court concluded that the plaintiffs were entitled to damages under section 303(b). The trial court made no findings on the relative importance of the union's various bargaining objectives in bringing about the strike.

The Ninth Circuit reversed, holding that section 303 permits recovery only if the unlawful conduct itself "materially contributed" to or was a "substantial factor" in bringing about the injury.[8] 523 F.2d at 1376. To allow recovery under the district court's standard, it concluded, would conflict with the Supreme Court's command that section 303 be used to penalize the union only for illegal secondary activities, and not for lawful primary conduct. *See* 523 F.2d at 1378, *citing United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and *Local 20, Teamsters Union v. Morton*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).[9] By requiring the employer to show that the union's violation of section 303(a) was a substantial factor in causing the injury, the court preserved the employer's right to compensation for losses proximately caused by the union's unfair labor practice, without jeopardizing the union's right to engage in lawful primary picketing.

We believe that the Ninth Circuit has correctly interpreted the causation requirement in section 303(b). To receive a damage award under that provision, the plaintiffs in this case must demonstrate not that

the unlawful hot cargo cause was *an* object of the BCOA strike, but that it was a *substantial factor* in or *materially contributed* to the Union's decision to call and maintain that strike.[10] The mere fact that the agreement the Union sought to obtain by striking contained a hot cargo clause is not enough, without more, to support a finding that the clause was a substantial factor.

The prior opinions in this case have not resolved this issue. The district court's liability opinion is confined to a discussion of sections 8(b)(4) and 303(a). It contains no determination of the proximate cause issue presented by the section 303(b) damage claim. Although the recommendation of the magistrate does state that she found the clause to be a substantial cause of the strike, that finding is based on her conclusion that the district court's liability opinion compelled such a result.

Because, as previously explained, the liability opinion did not address the problem, that opinion cannot control the resolution of that issue. Consequently, we believe that the district court, or the magistrate, must be given an opportunity to consider the matter *de novo* and to take whatever additional evidence is necessary to determine whether the hot cargo clause materially contributed to the decisions to call or maintain the BCOA strike. For that reason, the issue will be remanded.

IV

The Union advances three arguments why H & H should not have been awarded damages for the losses it claims to have suffered. First, there was not sufficient evidence to show that the injury to H & H

---

**8.** The court stated that illegal conduct was not a "substantial factor" or "material contribut[ion]" to a strike where "[the lawful] objectives, standing alone, would have caused the strike, but the unlawful objective, standing alone, would not. Restatement (Second) of Torts § 432; W. Prosser, Law of Torts § 41 at 238–40 (4th ed. 1971); 2 F. Harper & F. James, Torts § 20.3, at 1121–23 (1956)." 523 F.2d 1379.

**9.** In *Gibbs*, the Court interpreted *Morton* as permitting "recovery under § 303 of damages

suffered during a strike characterized by proscribed secondary activity only to the extent that the damages claimed were the proximate result of such activity; damages for associated primary strike activity could not be recovered." 383 U.S. at 731 n. 17, 86 S.Ct. at 1141 n. 17.

**10.** If the strike is found to have occurred in distinct phases, with separate causes for the different periods of the work stoppage, the hot cargo clause must be determined to be a substantial factor for each period in which damages are awarded.

was caused by the Union. Second, even if it could be shown that the UMWA was responsible, the conduct involved was not the type of activity covered by the district court's liability opinion. Third, the Union claims that H & H did not prove its damages with reasonable certainty. We conclude that there is merit in the Union's first contention. Because it appears that the proper test for determining union agency may not have been applied, the matter will be remanded so that a fuller factual determination may be made.

During the BCOA strike, H & H was visited by men wearing UMWA logos and told to cease operations while the strike continued. In addition, there may have been sporadic picketing at the companies to and from which H & H hauled. These companies did close for portions of the strike. The Union argued before the magistrate that H & H had failed to prove that the persons who threatened the Hannas were agents of the UMWA and that the Union could therefore not be held responsible for their conduct. The magistrate determined that agency was established by the fact that the Union had authorized the strike. This determination was apparently adopted by the district court in its damage order.

To be held liable for the actions of individuals, a union must be shown to have "instigated, supported, ratified or encouraged" the particular activities in question. *Kerry Coal Co. v. United Mine Workers of America*, 637 F.2d 957, 963 (3d Cir.), *cert. denied*, 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). *See Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). Calling a strike is not, by itself, sufficient to make the Union responsible for all illegal conduct committed during that strike. *See Kerry Coal, supra.* In addition, when damages are claimed against an international union, a district, and a local, the plaintiff must make a separate showing of agency for each defendant. In the present case, there was no finding that any level of the UMWA authorized or in any way supported the individuals who threatened the Hannas. Thus, on this record none of the Union entities, may be held responsible for that conduct. Accordingly, the matter will be remanded so that the issue of agency can be determined under the standards set forth in *Kerry Coal* and *Carbon Fuel*.

The UMWA also claims that the magistrate erred in determining that the injury suffered by H & H was of the type covered by the liability opinion. It maintains that any attempt to shut down H & H was unrelated to the Union's efforts to obtain and enforce the hot cargo agreement, because H & H did not haul from BCOA mines. The magistrate found, however, that H & H lost business because the strike prevented it from hauling coal. If, on remand, the magistrate ascertains that the hot cargo clause was a substantial factor causing the strike, H & H is entitled to recover for losses attributable to the strike. Of course, injury caused by the threats made at the H & H garage is compensable only if the magistrate finds both agency and causation.

H & H was awarded damages by the magistrate for losses suffered between November 1974 and April 1975, finding that the BCOA and WPCHA strikes and the other efforts to enforce Article II(g) caused the six month decline in H & H's business. The Union argues that the award of damages after December 6, 1974 is clearly erroneous as too speculative because no direct pressure was put on H & H after that date. We disagree. It was not clearly erroneous for the magistrate to hold the UMWA liable for those damages during the period of its admittedly unlawful activity. The evidence was sufficient to support the determination that the entire downturn was attributable to the strike. *See generally Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 263–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946); *Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251 (3d Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). If, on remand, the magistrate were to determine the agency and substantial cause issues in favor of H &

H, damages could be awarded to H & H for this period.

## V

■ In a proceeding involving unliquidated damages, such as the present case, the decision whether to award prejudgment interest is committed to the sound discretion of the district court. *See Lodges 743 & 1746, Intl. Assn. of Machinists v. United Aircraft,* 534 F.2d 422, 445–47 (2d Cir.1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); *Thomas v. Duralite Co.,* 524 F.2d 577, 589 (3d Cir.1975); *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 973 (3d Cir.1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976); *Nedd v. United Mine Workers of America,* 488 F.Supp. 1208 (M.D.Pa.1980). Prejudgment interest was awarded to Beunier and Henderson, but not to H & H. Both sides challenge aspects of those determinations on the ground that the district court abused its discretion. The Union disputes the award to Beunier and Henderson; the plaintiffs complain of the denial of such an award to H & H.

■ As the magistrate correctly noted, a district court is to consider four factors in determining whether an award of prejudgment interest is appropriate:

> (1) whether the claimant has been less than diligent in prosecuting the action;
>
> (2) whether the defendant has been unjustly enriched;
>
> (3) whether an award would be compensatory; and
>
> (4) whether countervailing equitable considerations militate against a surcharge.

*Nedd v. United Mine Workers of America, supra,* 488 F.Supp. at 1219–20. The magistrate found that the plaintiffs had been diligent, and that there would be some compensatory value in an award of prejudgment interest, but that such value was offset by the equitable consideration that the Union was unable "to foresee the illegality of [its] 1974 negotiations." Recommendation of Special Master on Damage Claim of H & H Hauling Co., C.A. No. 76–955 at 9

(Feb. 18, 1982), Appx. at 679–80a. See also Recommendation of Special Master on Damage Claim of Paul Henderson Trucking, C.A. No. 76–955 at 12–17 (Feb. 18, 1982), Appx. at 665–70a. The magistrate determined that the Union had been unjustly enriched at the expense of Beunier and Henderson, because their employees paid dues to the Union and the companies themselves contributed to the UMWA Pension Fund. For this reason, Beunier and Henderson were awarded prejudgment interest. Because the UMWA received no monetary enrichment from H & H during the liability period, H & H was found not to be entitled to prejudgment interest.

■ The Union claims that it was not unjustly enriched at the expense of Beunier and Henderson because it did not have the use of their money during the liability period, since the pension payments went to the Fund, and the dues came from employees rather than the plaintiffs. *See Nedd, supra;* Restatement (Second) Contracts § 370 comment (a). Unjust enrichment has been defined as follows:

> To the extent defendant has had the free use of the income-producing ability of plaintiffs' money without having to pay for it, he has been unjustly enriched. To divest defendant of this unjustified benefit is not to penalize him, for it has been determined by the trial that it was never rightfully his.

*Recent Developments—Prejudgment Interest as Damages: New Application of an Old Theory,* 15 Stan.L.Rev. 107, 109 (1962), *cited in Nedd, supra.* After reviewing the two elements upon which the magistrate based her recommendation, we conclude that they do not meet the requirements of unjust enrichment. Accordingly, that portion of the damage award will be reversed.

The first item identified by the magistrate was the money which the plaintiffs contributed to the Pension Fund as part of their obligations under 1974 NBCWA. This Court has held, however, that the Union and the Pension Fund are two separate entities. *See Nedd v. United Mine Workers*

*of America,* 556 F.2d 190 (3d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978). A union has neither the right nor the authority to control the spending and investment of pension fund contributions. *Nedd, supra.* Since the UMWA did not have the use of that money, it cannot be said to have been unjustly enriched by the plaintiffs' contributions to the Fund.

In addition to the pension contributions, the magistrate found that the UMWA was also unjustly enriched by the dues it collected from the employees of Beunier and Henderson. Most of those employees appear to have been members of the Union before their employers signed the 1974 NBCWA. Inasmuch as there was no showing that these employees would have resigned from the Union in 1974, the Union would have received those dues payments regardless of its illegal conduct. More importantly, the money was not paid by the plaintiffs. Nor was it money the plaintiffs would otherwise have been able or entitled to use. Thus, the union did not receive any benefit at the plaintiffs' expense.[11] In fact, any benefit the UMWA received from the dues was conferred by its members, not by the plaintiffs.[12]

Neither the dues payments nor the Pension Fund contributions unjustly enriched the UMWA at the plaintiffs' expense. In her recommendations, the magistrate determined that, absent unjust enrichment, prejudgment interest would not be appropriate in this case. Because of that conclusion, it is unnecessary for us to remand the matter for further consideration. Instead, we will reverse the award of prejudgment interest to Beunier and Henderson.

■ H & H argues that it is entitled to prejudgment interest because "[t]he Union was unjustly enriched . . . by enhancing its successful (albeit illegal) organizing efforts elsewhere in the coal fields." *Appellees' Brief* at 35. This type of speculative, intangible benefit is not within the definition of unjust enrichment that we have adopted. Thus, it could not have been an abuse of discretion for the district court to refuse to award prejudgment interest to H & H.

## VI

■ Plaintiffs claim that the district court erred in concluding that the Union was exempt from antitrust liability for its illegal conduct. They maintain that they should be entitled to collect treble damages for the injury they suffered as a result of Article II(g). After reviewing the district court's liability opinion, we conclude that the proper legal standard was applied and that the factual findings were not clearly erroneous. Accordingly, the judgment of the district court on this issue will be affirmed.

The intersection of the labor and antitrust laws is one of the more difficult areas of federal jurisprudence. As one of the leading commentators has explained:

> From the outset, the difficulty in applying the antitrust concept to organized labor has been that the two are intrinsically incompatible. The antitrust laws are designed to promote competition, and unions, avowedly and unabashedly, are designed to limit it. According to classical trade union theory, the objective is the elimination of wage competition among all employees doing the same job in the same industry. Logically extended, the policy against restraint of trade must condemn the very existence of labor organizations, since their minimum aim has always been the suppression of any

11. The Restatement (Second) of Contracts addresses this aspect of unjust enrichment in its discussion of restitution. "The benefit must have been conferred by the party claiming restitution. It is not enough that it was simply derived from the breach." Section 370 comment (a).

12. Ronald Beunier was himself a member of the UMWA and so the Union did receive $12/month directly from that plaintiff. The liability period ran no more than six months, however, and we consider the $72 received by the UMWA during that time to be a *de minimus* amount in the context of this case. It cannot, therefore, justify a finding of unjust enrichment.

inclination on the part of working people to offer their services to employers at different prices.

St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law,* 62 Va.L.Rev. 603, 604 (1976) (footnote omitted). The Supreme Court has responded to this conflict by creating two exemptions from the coverage of the antitrust laws for labor organization activities. The first, the so-called "statutory" exemption, protects the union from liability when it acts alone. *See Allen Bradley v. Local 3 IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). The second "non-statutory," exemption is much less clear, but it generally applies when a union, acting with a non-labor party, seeks to attain goals which are mandatory or permissive subjects of bargaining under the National Labor Relations Act,[13] unless the Union acts with a predatory anti-competitive purpose. *See Connell Construction Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Connell,* the Supreme Court held that the non-statutory exemption did not shield a union when an employer sought injunctive and declaratory relief for injuries caused by the union's violation of section 8(e) of the Labor Act, the hot cargo provisions.

This Court was presented with the question of the proper application of *Connell* to antitrust damage suits in *Consolidated Express, Inc. v. N.Y. Shipping Assn.,* 602 F.2d 494 (3d Cir.1979), *vacated and remanded on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), *modified,* 641 F.2d 90 (3d Cir.1981) (*Conex*). The *Conex* court distinguished suits seeking monetary recovery from those asking only injunctive relief on the ground that the former, because of their cost, have a greater tendency to chill lawful union activity. The Court concluded that a broader exemption from antitrust liability was justified in damage actions and held that an antitrust plaintiff would establish a prima facie case under section 4 of the Clayton Act by showing that he had been injured in his business or property by "a collective bargaining agreement, or conduct taken pursuant to it, [which] has been shown to be illegal under federal labor law." *Conex* at 521. The Union defendant could, however, rebut the prima facie case by proving "first, that at the time [it] acted, . . . [it] could not reasonably have foreseen that the subject matter of the agreement being challenged would be held to be unlawful under § 8(b)(4) or § 8(e)." To prevail, the union "must also demonstrate that the contract provisions and steps taken to implement them were 'intimately related' to the object of collective bargaining thought at the time to be legitimate, and went no further in imposing restraints in the secondary market than was reasonably necessary to accomplish it." *Conex* at 521. If the Union could persuade the district court of these facts, declared *Conex,* then it would be entitled to the non-statutory exemption from damage liability under section 4 of the Clayton Act.

In the present case, the district court correctly analyzed the antitrust issue by applying the *Conex* test and, after extensive factual analysis, determined that the UMWA had successfully rebutted the plaintiffs' prima facie case and was therefore exempt from antitrust liability. The plaintiffs, pointing to facts in the record that would support a contrary result, argue that the court's findings on foreseeability and the "reasonably necessary" scope of Article II(g) are clearly erroneous. The "clearly erroneous" standard of review requires more, however, than a showing that a contrary factual determination would have been possible. It does not matter that this Court, confronting the facts *de novo,* might

---

**13.** Mandatory subjects of bargaining are "wages, hours and other terms and conditions of employment." 29 U.S.C. § 158(d), National Labor Relations Act § 8(d). The parties are required to discuss these issues in negotiations. All other lawful areas of negotiation are considered permissive subjects; on these topics, the parties may bargain, but they cannot be compelled to do so. *See National Labor Relations Board v. Borg-Warner Corp.,* 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958).

view them in a different light. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). We may reverse only if, after reviewing the record, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Our examination of the evidence adduced in this case has not produced any such conviction. At best, the testimony shows that more than one set of factual conclusions could have been drawn by the district court. Consequently, we cannot say that the facts it found were clearly erroneous. The judgment of the district court that the UMWA was exempt from antitrust liability for damages will be affirmed.

## VII

The damage awards will be vacated and this case remanded to the district court for further findings consistent with this opinion on the issue of causation during the BCOA strike and a determination of the agency question presented in the magistrate's recommendations relating to H & H. The award of prejudgment interest will be reversed. In all other respects the district court's judgment will be affirmed.