**WACO SCAFFOLDING COMPANY**

**v.**

**LOCAL 845, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA**

**and**

**The Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America.**

**Civ. A. No. 82–1766.**

United States District Court, E.D. Pennsylvania, Civil Division.

Feb. 15, 1984.

---

**104**

Kenneth L. Oliver, Jr., Philadelphia, Pa., for plaintiff.

William J. Einhorn, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

CAHN, District Judge.

Waco Scaffolding Company ("Waco"), the plaintiff, seeks money damages from the defendants, two labor organizations, pursuant to Section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187 ("Section 303").[1] Waco contends that agents of the defendants, acting within the scope of their employment, committed unfair labor practices as defined in the LMRA while plaintiff was engaged in performing a subcontract at the B.P. Oil Refinery in Marcus Hook, Delaware County, Pennsylvania. The matter has been tried before me without a jury. Post trial briefing and argument have been completed. I make the following:

## FINDINGS OF FACT

1. Waco Scaffolding Company, the plaintiff, is a Pennsylvania corporation with its principal place of business in Phila-

---

1. 29 U.S.C. § 187 states in pertinent part:

"(a) It shall be unlawful ... for any labor organization to engage in any activity or conduct defined as an uunfair labor practice in Section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section may sue therefor ... and shall recover the damages by him outlined and the cost of the suit."

29 U.S.C. § 158 ("Section 8(b)(4)(D)") states in pertinent part:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is—

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class, rather than to employees in another labor organization, or in another trade, craft, or class. ... "

delphia, Pennsylvania. It is engaged in the business of selling, renting and installing steel scaffolding used in industrial construction.

2. (a) Local 845, United Brotherhood of Carpenters and Joiners of America ("Local 845"), a defendant, is an unincorporated labor organization of "Carpenters of the Vicinity of Delaware County, Pennsylvania".

(b) The Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("MDC"), a defendant, is an unincorporated labor organization of carpenters' "Local Unions in the vicinity of Philadelphia, Pennsylvania, including the counties of Philadelphia, Bucks, Montgomery, Chester and Delaware, ...."

3. Local 8, United Brotherhood of Carpenters and Joiners of America ("Local 8") is an unincorporated labor organization comprised of "the carpenters of the vicinity of Philadelphia, Bucks, Montgomery, Delaware and Chester counties". In the past, Local 8 has regularly supplied carpenters for Waco in the geographical area of the MDC.

4. Local 845 and Local 8 are both local unions within the jurisdiction of the MDC and as such the members of both locals are permitted to work as union carpenters in the five county metropolitan area of Philadelphia.

5. (a) Earl R. Henninger is a member of Local 845;

(b) Earl R. Henninger is employed as a business representative of the MDC, having been elected by the membership of Local 845 and assigned to a territory in Delaware County which encompasses the jurisdiction of Local 845;

(c) Earl R. Henninger is held out by Local 845 as its business representative;

(d) During the performance by Waco of its subcontract at the B.P. Oil Refinery ("Refinery") in Delaware County, Pennsylvania, Earl R. Henninger was specifically authorized by the MDC to act as an em-

ployee and agent concerning labor activities at the Refinery work site;

(e) During the performance by Waco of its subcontract at the Refinery work site, Earl R. Henninger was impliedly authorized by Local 845 to act as an employee and agent concerning labor activities at the Refinery work site.

6. (a) William F. McGugan is a member of Local 8 and is employed as a business representative of the MDC, although elected from the membership of Local 8;

(b) William F. McGugan was authorized to act as an employee of MDC concerning labor activities at the work site where the instant dispute began.

7. Edward Coryell is the president and business manager of the MDC and is considered to be its chief executive officer. He supervises the activities of Earl R. Henninger and William F. McGugan.

8. All of Waco's hourly-paid construction employees are members of a labor union (most are members of Local 8), and are subject to the provisions of collective bargaining agreements to which Waco is a party.

9. Waco is an associate member of the General Building Contractors Association ("GBCA"), and is a party to a collective bargaining agreement entered into by GBCA and MDC. This agreement is hereinafter referred to as the "GBCA Agreement".

10. Waco is also bound by a collective bargaining agreement between United Brotherhood of Carpenters and Joiners of America and the National Erectors' Association which covers work involving the erection of scaffolding. This agreement is hereinafter referred to as the "NEA Agreement".

11. Neither the GBCA Agreement nor the NEA Agreement require the employment of non-working foremen at a work site, and neither agreement mandates that any specific procedure be followed when hiring union carpenters.

12. (a) On or about March 1, 1982, Waco entered into a construction subcon-

tract with Henkels & McCoy, Inc. Waco agreed to provide and erect steel scaffolding needed by Henkels & McCoy to complete maintenance work at the Refinery. Time was of the essence in the performance of this contract because the Refinery had to cease operations while the maintenance work was being performed;

(b) The parties agree that the NEA Agreement is applicable to plaintiff's work at the Refinery job site.

13. Earl R. Henninger ("Henninger") knew that Waco's normal practice was to hire union carpenters from Local 8. Beginning in March of 1982, Henninger insisted that Waco not be permitted to follow its normal practice in regard to hiring union carpenters. Instead, Henninger demanded that Waco be required to employ Local 845 carpenters, due to the high unemployment rate for union carpenters in Delaware County. Henninger threatened that labor difficulties would befall Waco unless his demand was met.

14. Beginning in March of 1982 and through completion of Waco's subcontract at the Refinery, Francis Rudolph ("Rudolph") was steward for Local 845 at the job site and was appointed as such by Henninger. During this time period, Rudolph refused to allow Waco foremen to perform carpentry work at the Refinery job site. Rudolph threatened that Local 845 members would engage in work slowdowns if Waco foremen performed carpentry work.

15. Waco complained to Edward Coryell ("Coryell"), president of the MDC, that Waco's foremen were being prevented from performing work at the job site, in violation of both the GBCA and NEA collective bargaining agreements. Coryell agreed that neither contract prevented the foremen from working on the job site and stated that the problem would be resolved in Waco's favor. However, the Waco foremen were never permitted to work at the Refinery work site in other than a supervisory capacity. Testimony to the contrary is not persuasive.

16. During the Refinery construction project, other labor difficulties arose and other threats were made by Henninger, all in an attempt to secure employment for members of Local 845 to the exclusion of members of other carpenter locals within the jurisdiction of the MDC. In addition, racial problems occurred at the job site when white members of Local 845 shouted racial epithets at some of Waco's black employees who were members of Local 8.

17. On March 20, 1982, members of Local 845 whom Henninger referred to the Refinery project walked off the job site, protesting Waco's decision to lay off other Local 845 union carpenters.

18. The hourly rates for carpenter foremen, including base pay, fringes, taxes, insurance, overhead and profit are: $31.57 per hour for regular time; $43.66 per hour for time and one-half time; and $55.72 per hour for double time.

19. The hours foremen worked on the job are: 792 hours of regular time; 430 hours of time and one-half time; and 70 hours of double time.

20. The total cost for foremen time on the job is $47,677.64.

21. The hourly rates for carpenters at the Refinery job site, including base pay, fringes, taxes, insurance, overhead and profit are: $27.00 per hour for regular time; $43.66 per hour for time and one-half time; and $55.72 per hour for double time.

22. Waco budgeted 3,800 hours of regular time and 1,200 hours of time and one-half time as the amount of time union carpenters would be required to work at the Refinery job site.

23. The hours union carpenters worked on the Refinery job site in excess of the hours budgeted for the job site are: 255.5 hours of regular time; 578.5 hours of time and one-half time; and 297.5 hours of double time.

24. The total over-budget cost for carpenter time on the job is $42,583.00.

25. After completion of its maintenance work at the Refinery, Henkels & McCoy informed Waco that Henkels & McCoy had performed additional work on the job site,

which work had been originally assigned to Waco.

26. Henkels & McCoy advised Waco that Henkels & McCoy would deduct or "back charge" $77,000.00 from Waco's contract fee.

27. Waco settled the Henkels & McCoy "back charge" claim by paying $15,000.00 to Henkels & McCoy.

## DISCUSSION

### A. *Arbitrability of Dispute*

■ Defendants initially argue that Waco has failed to exhaust the contractual remedy of grievance arbitration. Article VI of the NEA Agreement states, "[a]ll grievances, other than those pertaining to jurisdiction or general wage rate on any work governed by this Agreement, shall be handled in the following [multi-step procedure culminating in binding arbitration]...." Plaintiff urges that its cause of action relates to a jurisdictional dispute between rival classes of union employees. Waco claims that Article VI of the NEA Agreement specifically exempts jurisdictional disputes from contractually-mandated grievance arbitration. Defendants contend that this seemingly broad exclusion must be narrowly construed due to language in Article I(2) of the NEA Agreement referring inter-union jurisdictional disputes to the general presidents for resolution.[2]

Relying on the language of Article I(2), defendants argue that the Article VI grievance procedure "excludes from coverage only those jurisdictional disputes that involve competing claims by two *"separate and distinct crafts or labor organizations".* Defendants' Memorandum of Law in Support of Motion for Dismissal Under Rule 41(b), at 20 (emphasis added). They assert that the instant dispute is covered by the contractual grievance procedure, because Local 8 and Local 845 are engaged in the same trade or craft and are members of the same labor organization (presumably the MDC).

I reject defendants' contention that the NEA Agreement required grievance arbitration of Waco's claims against Local 845 and the MDC. Henninger sought to exclude employment of Local 8 carpenters, who were not from Delaware County, while he attempted to secure employment for Local 845 carpenters. In so doing, he involved Waco in a jurisdictional dispute between two local unions, who are clearly, in defendant's words, "separate and distinct ... labor organizations." *See id.* Such disputes are clearly exempted from contractually established grievance procedures. Therefore, Waco committed no error by eschewing the Article VI grievance remedy in this case.

■ Moreover, the presumption of arbitrability for claims brought under Section 301 of the LMRA, 29 U.S.C. § 185[3] ("Section 301"), is reversed for Section 303 claims. *Compare United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) (Section 301 claim), *with Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446, 458 (5th Cir.1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971) (Section 303 claim); *Old Dutch*

---

2. Article I(2) of the NEA Agreement states in pertinent part:

It is further agreed that should the plant owner also award work to the Company that is within the recognized and traditional jurisdiction of another union with which the Company has a similar Agreement for the performance of that work, then work assignments shall be made in accordance with the Agreements and Decisions of Record, established trade practice, or prevailing area practice. Since presently established jurisdictional dispute settlement procedures are not applicable to the work covered by this Agreement, then any disputes that arise from such assignments shall be referred to the respective General Presidents for resolution....

3. 29 U.S.C. § 185(a) reads, in pertinent part:

Suits for violation of contracts between an employer and a labor organization .... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

*Farms, Inc. v. Milk Drivers' Local Union No. 584,* 359 F.2d 598, 603 (2d Cir.1966), *cert. denied,* 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966) (Section 303 claim). Section 301 claims are private contractual actions arising from an alleged violation of the collective bargaining agreement. The interpretation of a collective bargaining agreement is a function traditionally reserved for arbitrators. *Old Dutch Farms,* 359 F.2d at 602. Section 303 claims are public tort actions arising from alleged violations of Section 8(b)(4) of the Labor Management Relations Act (LMRA) and are thus appropriate to the expertise and power of courts. *Id.* The LMRA proscribes strikes, threats, coercion and restraint related to jurisdictional disputes. 29 U.S.C. § 158. It also provides for the recovery in tort of damages proximately caused thereby. 29 U.S.C. § 187(b). Where suit is brought under Section 303 the merits of that action are governed by the statutory standards and remedies of the LMRA, and not by the terms of parties' collective bargaining agreement. Such issues of statutory interpretation and remedies are particularly suited to judicial resolution.[4] *Old Dutch Farms,* 359 F.2d at 602. In Waco's case, the parties' collective bargaining agreement explicitly omits jurisdictional clashes such as the dispute between Local 8 and Local 845 from the contractual grievance procedure.

> [A]bsent a clear, explicit statement in the collective bargaining contract directing an arbitrator to hear and determine the validity of tort damage claims by one

party against another, it must be assumed that the employer did not intend to forego his rights under Section 303 and that the parties did not intend to withdraw such disputes from judicial scrutiny.

*Id.* at 603. Obviously, defendants can point to no "clear, explicit statement" in the NEA Agreement which confers arbitral jurisdiction over Section 303 tort claims. Therefore, defendants' argument that Waco has failed to exhaust contractual remedies is without merit.

### B. *Waco's Section 303 Cause of Action*

■ Section 303 actions are based and directly depend on violations of Section 8(b)(4). The literal statutory requirements of Section 8(b)(4)(D) are clearly met in this case.[5] I find that the MDC and Local 845, through their duly designated agents, Coryell and Henninger, threatened, coerced, or restrained Waco and also induced a work stoppage at the site. The judicially inferred requirements of a Section 8(b)(4)(D) jurisdictional dispute, however, pose a closer question on the facts of this case. To bring a cause of action within Section 8(b)(4)(D), a plaintiff must show the existence of 1) separate employee entities, and 2) rivalry between those two groups, as is more fully explained below.

Although the Supreme Court has focused on traditional Section 8(b)(4)(D) jurisdictional disputes between two distinct craft units, the Court has provided a broad defi-

---

**4.** Of course, instances will arise in which Section 301 and Section 303 damages will overlap. Where such overlap occurs, the preferable approach is to assess the relative weights of the two actions on a case-by-case basis to determine the respective roles of arbitration and litigation. *See, e.g.,* Note, *Tort Damages under Section 303 of the Labor Management Relations Act: Arbitration or Litigation,* 52 CORNELL L.Q. 1002, 1010 (1967). The most that is done—and then only in the marked minority of cases—is to stay, not dismiss, the Section 303 litigation pending the Section 301 arbitration. *Compare Bechtel Corp. v. Local 215, Laborers' Int'l Union,* 544 F.2d 1207, 1215 (3d Cir.1976), *with Vulcan Materials Co. v. United Steelworkers,* 430 F.2d 446; *Twin Excavating Co. v. Local Union 631,* 337 F.2d 437 (7th Cir.1964); *United States Steel*

*Corp. v. Seafarers Int'l Union,* 237 F.Supp. 529 (E.D.Pa.1965). Here, in contrast to the aforementioned cases, plaintiff did not bring a Section 301 action, and the parties exempted jurisdictional disputes from the coverage of the grievance procedure. Defendants have made no suggestion and have made no showing that Waco's Section 303 action was merely a pretext to avoid the contractual grievance remedy. *Cf. Wilkes Barre Publishing Co. v. Newspaper Guild Local 120,* 647 F.2d 372, 381 (3d Cir.1981); *Fuller v. Guthrie,* 565 F.2d 259, 261 (2d Cir.1977); *Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd.,* 385 F.2d 158 (2d Cir.1967).

**5.** *See* footnote 1, *supra,* at page 104.

nition of such disputes. It is clear that a jurisdictional dispute may arise whenever two groups of employees claim the same work assignment. *See, e.g., NLRB v. Plasterers' Local Union No. 79,* 404 U.S. 116, 135, 92 S.Ct. 360, 371, 30 L.Ed.2d 312 (1971); *NLRB v. Radio Engr's Union,* 364 U.S. 573, 584, 81 S.Ct. 330, 337, 5 L.Ed.2d 302 (1961). Further, inasmuch as the above cases were Section 10(k) proceedings,[6] the court left open the potential breadth of Section 8(b)(4)(D) in Section 303 suits by indicating that no "substantive symmetry" between Section 10(k) and Section 303 is necessarily required. *Radio Eng'rs,* 364 U.S. at 585, 81 S.Ct. at 337. In subsequent Section 10(k) proceedings, the National Labor Relations Board has applied Section 8(b)(4)(D) to employee groups within and beyond unions. *See, e.g., ILA Local 1911, 236 NLRB No. 191,* 98 L.R.R.M 1593 (1978) (dispute between union and unrepresented group); *Bricklayers Local,* 188 NLRB No. 15, 76 L.R.R.M. 1280 (1971) (dispute between two groups within same local).

■ While there are no reported Section 303 decisions with facts identical to the instant case, the direction of the case law and the broad sweep of Section 8(b)(4)(D)'s language—specifically, the reference to "employees in a particular labor organization, or in a particular trade, craft or class" —would seem to encompass jurisdictional disputes between two locals of the same craft. Therefore, I find that Local 8 and Local 845 are distinct entities for the purpose of Waco's Section 303 action. The facts demonstrate that Local 8 and Local 845 regard themselves as separate labor organizations, and they shall be treated as such.

I now consider whether Local 8 and Local 845 asserted competing claims to the work at the Refinery job site. Defendants argue that an employer may bring a Section 303 action only when the plaintiff is a relatively passive victim and is caught between rival claims. Defendants assert that in this case, Waco was neither passive nor was Waco caught between rival claims by the unions for the carpentry work.

I must reject defendants' argument that Local 8 did not claim the carpentry work at the Refinery job site. It is undisputed that, as a matter of practice, Waco regularly utilizes Local 8 to perform carpentry work at job sites in the Philadelphia area. Prior to the commencement of the Refinery project, Waco contacted Local 8's William McGugan, and informed McGugan of Waco's plan for staffing the project using members of Local 8.

Once Henninger claimed the carpentry work for Local 845, Local 8, through its designated agent William McGugan, played a fluctuating role. At times it acceded to Local 845's claim, by requiring Waco's agent to obtain carpenters by contacting Henninger. However, at other times, McGugan was more actively cooperative. In the week preceding the work stoppage, at the instance of district council president Earl Coryell, McGugan claimed control of the disputed work.

On the basis of these facts, I find that Local 845 asserted a "competing claim" to the carpentry work at the Refinery job site. Courts have evaluated relatively passive conduct by one group of employees as constituting a "competing claim" to the work in question, which work another employee seeks through prohibited means. *See, e.g., International Longshoremen's Ass'n v. Juneau Spruce,* 342 U.S. 237, 245, 72 S.Ct. 235, 240, 96 L.Ed. 275 (1952); *Construction Employers Ass'n v. International Union of Operating Eng'rs Local 450,* 427 F.2d 230, 232–33 (5th Cir.1970); *cert. denied,* 400 U.S. 926, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *International Bhd. of Carpenters v. C.S. Montag & Sons,* 335 F.2d 216, 221 (9th Cir.1964), *cert. denied,* 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965); *Local 978 v. Markwell,* 305 F.2d 38, 47 (8th Cir.1962). Though Local 845 may not have constantly asserted its right to the carpentry work at the job site, such assertions are

---

**6.** Section 10(k) of the LMRA provides procedures for NLRB determination of unfair labor practice disputes arising under Section 8(b)(4)(D). *See* 29 U.S.C. § 160(k).

unnecessary to create a cause of action under Section 303. It is clear that Local 845 did not disclaim the right to perform the work in question, and at times actually claimed as its own the work performed by Local 845. *Cf. Stromberg-Carlson Communications, Inc. v. NLRB,* 580 F.2d 939, 941-2 (9th Cir.1978) (disclaimer of work by union moots employer's Section 8(b)(4)(D) cause of action). Such activity by Local 8 was sufficient to assert a "claim" to the work performed by Local 845.[7]

■ Defendants also argue that Waco does not have valid Section 8(b)(4)(D) claim, because Waco itself presented the only competing "claim" to Local 845, due to Waco's alleged "preference" for Local 8. *Defendants' Memorandum of Law in Support of Motion For Dismissal Under Rule 41(b),* at 16. I have previously determined, however, that Local 8 did assert a right to perform the work commandeered by Local 845 at the Refinery job site. Moreover, that Waco may have preferred that Local 8 perform the work does not eviscerate Waco's Section 303 cause of action. Federal courts have recognized that the focus of such statutory provisions as Section 8(b)(4)(D) and Section 10(k) is "protecting the employer from the economic havoc of jurisdictional strikes." *NLRB v. Plasterers' Local Union,* 404 U.S. 116, 127-33, 92 S.Ct. 360, 367-370, 30 L.Ed.2d 312 (1971). And realistically speaking, the employer may at times be more interested in the jurisdictional dispute than the employees in question. In fact, the National Labor Relations Board regularly considers employer preference and economic efficiency when attempting to resolve a Section 10(k) dispute. *See, e.g., ILWU, Local 62-B (Alaska Timber Corp.),* 261 NLRB No. 153, 110 LRRM 1211 (1982).

C. *Waco's Entitlement to Money Damages*

■ Having determined that Waco's cause of action is properly brought pursu-ant to Section 303, I now turn to a consideration of causation, agency and damages. The parties agree that the relevant standards of causation and agency for Section 303 actions are set out in *Feather v. United Mine Workers of America,* 711 F.2d 530 (3d Cir.1983). In *Feather,* Judge Adams ruled that Section 303(b) [8] requires a "causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff." *Id.* at 537 (citations omitted). That is, the conduct of the defendant union(s) must be a substantial factor in or materially contribute to the plaintiff's losses. *Id.* at 538 (citations omitted). In addition, when damages are claimed against a district council and a local, the plaintiff must make a separate showing of agency for each defendant. *Id.* at 539. Injury caused by a union's violation of Section 8(b)(4)(D) is compensable under Section 303 only if the court finds both causation and agency. *Id.* at 538-39. Although, as *Feather* clearly establishes, agency and causation must both be shown to support an award of damages under Section 303, the amount of damages may be determined under the relatively relaxed standard of reasonable approximation, rather than exact certainty. *See, e.g., Kerry Coal Co. v. UMW,* 637 F.2d 957, 966 (3d Cir.1981), *cert. denied,* 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981); *Mead v. Retail Clerks,* 523 F.2d 1371, 1377 (9th Cir.1975).

In the instant case, I find that Waco has made out a sufficient showing of agency as to both Local 845 and the MDC. The MDC employed Henninger as its agent in Delaware County. Henninger had both actual and apparent authority to represent the MDC at the Refinery job site. Coryell, too, acted as the MDC's agent, and possessed the actual and apparent authority to do so. McGugan functioned as an MDC agent at the Refinery job site, and was authorized to so function, both actually and apparently.

---

7. *Penello v. Local Union No. 59,* 195 F.Supp. 458 (D.Del.1961) is not to the contrary. In that case, Chief Judge Wright concluded that there had been no violation of Section 8(b)(4)(D), because no rival claims had been made to the work in question. *Id.* at 462.

8. *See* footnote 1, *supra,* at page 104.

All three men's activities at the Refinery job site were well within the scope of their agency and employment. Henninger, among other individuals, also acted as Local 845's agent at the Refinery job site. Again, Henninger possessed actual and apparent authority to act as such.

I also find, however, that Waco has failed to prove that the $15,000 back charge it paid to Henkels & McCoy to settle the $77,000.00 back charge claim was sufficiently connected to any illegal activity attributable to the defendants. Similarly, the evidence in my view is insufficient to establish that the labor overrun on this job (the amount of labor required over and above the estimate) was substantially caused by the illegal activities of the agents of the defendants. There is reasonably persuasive evidence that Waco may have underbid the job and may have failed to anticipate the extent to which labor would be required on the Refinery site scaffolding.

On the other hand, I am convinced that the agents of the defendants actively prevented Waco's foremen from working on the job. This activity was in direct violation of both the NEA Agreement and Section 8(b)(4)(D). It was also done, in my estimation, to benefit Local 845 members at the expense of Waco. Both defendants are liable for damages caused by this statutory breach because Henninger was acting as an agent of Local 845, and because both Henninger and Coryell were acting as agents for MDC as employees of MDC. McGugan was also a participant in this matter, albeit to a lesser extent than Henninger and Coryell. As previously stated, Henninger, Coryell and McGugan all acted well within the scope of their agency and employment.

Plaintiff claims a total of $47,677.64 which represents the total cost for foremen time on the project. Plaintiff's theory is that all of these foremen hours were non productive, as the relevant collective bargaining agreements permit foremen to work at job sites. I find, however, that only 75 percent of this amount should be compensable. Certain activities of the foremen would have been limited to supervision in any event, and at least two of the foremen were paid while they commuted from the home office of Waco to the job site. This commuting time approximated one and one-half hours per day for two foremen. Consequently, judgment will be entered in favor of the plaintiff in the amount of $35,758.23.

I reach the following:

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over this controversy pursuant to Section 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b).

2. This court has *in personam* jurisdiction over the parties who have appeared here through their agents, employees and counsel.

3. Proper venue lies in this court under 28 U.S.C. § 1391(b).

4. Plaintiff is "an employer" engaged in "commerce" in an industry "affecting commerce" within the meaning of Sections 2(6) and 2(7) of the National Labor Relations Act, 29 U.S.C. § 152(6) and (7).

5. Defendants are "labor organizations" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

6. Both defendants have threatened, coerced and restrained plaintiff and have induced and encouraged persons employed by plaintiff to provide employment for members of Local 845, United Brotherhood of Carpenters and Joiners of America in violation of Section 8(b)(4)(i)(ii)(D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i)(ii)(D) including the illegal prohibition against work being performed by carpenter foremen.

7. As a direct and substantial result of said violations, plaintiff has been injured in its business and property in the amount of $35,758.23.